May it please the court, Mr. Young, any members of my client's family may be present. This is a difficult case. Carla Chavarria was denied her Sixth Amendment right to a fair trial, to present a defense, and the district court abused its discretion by actively encouraging her ex-husband, Valente Rubio, not to testify in the case. The testimony was the linchpin and, in fact, her only. Is encouraging enough? Is that a sufficiently strong statement? No, Your Honor. I think he even went beyond encouraging. He effectively drove Mr. Rubio from the witness stand. And if you look at the three cases where this issue is presented, you look at Arthur, you look at Webb, and you look at Santiago, this case, really, on the spectrum, if you'll take Arthur, the case that we're relying on, isn't where there was a reversal. The district court in this case even went beyond that in the following ways. First of all, the district court four times advised Mr. Rubio of his Fifth Amendment right, and repeatedly told him, four times to be specific, that he didn't have to answer. The court went beyond that. Four times, four separate times, the district court advised Mr. Rubio that based on the evidence that he had heard up to that point, that Mr. Rubio would be subject to criminal prosecution. Finally, Your Honors, the district court even went on to discuss the incident where Mr. Rubio blurted out, look, Carla didn't know. The court even offered its own analysis as if it were Mr. Rubio's attorney. This is the significance of that. The court looked at him and said, and this was after Mr. Rubio, after the court inquired of Mr. Rubio, he said, now, after everything I've heard, do you intend to answer Mr. Brown's question? And Mr. Rubio said to the court, I'll answer. And the court looked at Mr. Rubio, and I think it's evident in the transcript, asked him incredulously, you will? And this was after the court, even after the four, eight different admonishments went on to say that the statement that he made, look, Carla didn't know, that could be reasonably inferred that the reason why she didn't know is that Mr. Rubio himself set her up. So the case that the government relies on, Santiago, is very distinguishable. Because Santiago, one of the things the court's main point of analysis is the repetition of warnings. In that case, there were just two warnings, as I've mentioned before. Where did Santiago come from? Santiago is a First Circuit case out of Puerto Rico. And for the court's benefit, Arthur is a Sixth Circuit case, and of course, Webb is a Supreme Court case. Arthur is very, very similar to the facts. It's very on point that we have in the instant case. It not only involves the issue of overly admonishing a witness to the point of driving them from the witness stand, but then also involves the evidentiary issue of statements against interest. It's an on point case, and it's the one we're asking this court to rely on, at least in its analysis. What about a couple of Ninth Circuit cases, one called Vages, another called Harlan? Do you know those cases? I do not, Your Honor, but I'll make it my business to know them. They seem to raise the proposition that the judge's warning has to be threatening or coercive in order to be an abuse of discretion in precluding the witness from testifying. Is that good law? I don't believe so, Your Honor. I don't think it needs to rise to the level of what happened. I'm not familiar with the facts in those cases, as I told the court, but in Webb, you have a situation basically like that, where the judge has singled out the sole defense witness as someone who probably isn't going to be truthful and is very stern with that witness and says, look, I'm going to see to it personally you're indicted if I think your testimony is perjured. Do you think there's a distinction between perjury and self-incrimination? No. I think if you're perjuring yourself, you're ---- No, but I mean in terms of the judge's responsibility to sort of step in at some point and at least remind a witness that there's a risk they could be prosecuted for perjury or a risk they could be prosecuted for self-incrimination. I understand the question. I think at that point, that admonishment is going too far for the court. That might be something that counsel could inform the witness of, but that's too far for the court. Our position is that what the district court should do in situations like this, particularly given the nature of what a importation, the practical realities of an importation case, which I'll get to in a bit, the district court should go no further than merely advising a person of their Fifth Amendment right not to answer and their advice to counsel, and that's it. Beyond that, they should be allowed to testify. To get back to your question, Your Honor, I don't think it needs to rise to the level of badgering or intimidating a witness. I think as in this situation where you've got eight separate admonishments and then you have an analysis of the evidence so far and then you have an incredulous reaction from the judge when the witness still stands his ground and says, I will answer the question, and then the judge just calls it all off and says... Webb uses the word duress. Well, I think there was duress in this case. After eight separate admonishments and then an analysis of the evidence so far and how it tended to incriminate Mr. Rubio, I think at that point he was under a great deal of duress. I'm also asking the court to really concentrate on the transcript of Mr. Rubio because unfortunately it really doesn't come out in the black and white of the transcript. This is a man who took the witness stand and really was having a crisis of conscience. Now, is this her husband? Valente Rubio is Ms. Chavarria's ex-husband. Ex-husband. Is he the sheriff? No. Mr. Chavez or Officer Chavez is the LAPD police officer who is Ms. Chavarria's present husband. Okay. They have three children among them. The two oldest boys are Mr. Rubio's children. The youngest is Mr. Chavez's child. The parents have a very, how can we say, functional relationship for the benefit of the children up until this day, obviously, and shared custody and obligations among themselves very well. And that's what led to the discussion between Mr. Chavez and Mr. Rubio about the night's events. But if you really take some time to read it, and it's very short, read it and read it over and over, you can see that this is a man, Valente Rubio, who's having a crisis of conscience in a case where he, and he's not subpoenaed by us. He is subpoenaed by the government. And that's in the record. Who sat out in the hallway while this case was being trialed for days at a time, and the government did nothing with him. The government investigated him thoroughly. Mr. Rubio testified himself that they came to his work three times. Is there anything in the record that shows that Rubio would have gone beyond saying, I asked her to pick up the car in Mexico and bring it back? Yes. He, in fact, blurts out, look, Carla doesn't know anything about, and boom. And that's when the troubles began with the district court. If that's, how would he know whether Carla knew? Because I don't see how he's competent to make that testimony. Very simply, Your Honor, if he was the one who orchestrated the smuggling attempt and orchestrated it with one of its linchpins being an unknowing courier or a dupe or a patsy to drive the load across, then he would definitely know. And when we get into the testimony of Officer Chavez, and that, again, is Ms. Chavarria's present husband, when we get into the statements against interests, many of which were admitted by the court except for the one crucial one, which goes to your question, look, she didn't know. We only need to look to the court's own analysis when he was admonishing Mr. Rubio as to what was so significant about that statement and why it should be admitted. In a case like this, an importation case, what is the sole being of the case is whether or not the person actually knew. And the only defense that there is is really, other than arguing that the prosecution didn't meet its burden, is that the person was duped and that there's a third party who's culpable for the load found in the car. You necessarily have a reasonable inference at that point that if the person didn't know, they were set up. And in this instance, you had Mr. Rubio testifying, look, she didn't know. Does that statement necessarily incriminate Mr. Rubio? No. It, in fact, necessarily has to inculpate him because unless you're involved and you're involved in the smuggling venture, there really is no way you could know that the person who was caught didn't know unless you're the one who set them up. So it does inculpate him. He testified to a number of, I mean, a myriad of facts that would make the statement, look, Carla didn't know a very reasonable inference that he set her up. He knew about the type of drug, the quantity, where it was to be concealed. If you take just the pure question, did Carla know, that sounds like something he's incompetent to testify to. Now, you can bring in all other things which would show she didn't know, but it seems to me just by itself as a naked objection, it's a good objection. What about that? No, I think all by itself it is. It is an incompetent question, but within the context of this case, within the context of an importation case or a border bus case, if you have a third party that's willing to take the witness stand and say, look, the person didn't know, and here's why this person didn't know, they would be inculpating themselves, because they would then offer further explanation as to why they didn't know, i.e., that they were set up to do the smuggling venture. The question was actually, do you know whether or not Carla knew there were drugs in this car? So the answer should have been, yes, I know, or no, I don't know. And then the next question could be foundational. Well, how would you know? But there was no foundation allowed to be set up in order to know if he had any personal knowledge of whether she knew or not. I agree with the Court. And to further elucidate on the question, though, if you look in this type of case, and under this type of evidentiary or fact-proving, if you continually look at that statement, look, she didn't know, naked, as Your Honor referred to it, then it always is an incompetent question. But within the context of this case, particularly if you have a culpable third party who's testifying, that can offer a reason as to, okay, she didn't know, and here's why, the question should be admitted. Well, I'm saying maybe it was the prosecutor's, was this the defense attorney, was this on direct? Maybe it was the defense attorney's mistake in not laying the proper foundation or following up on the proper foundation. Well, that would be me, Your Honor, if anybody was going to mess it up. Well, I'm not asking because the question, he really didn't give a responsive answer to the question that was asked. It was a proper question that was asked. I would agree with that. Very proper question. The other thing I would, again, emphasize to the Court is read the transcript of Mr. Rubio. This, again, was a witness that was investigated by the government, was subpoenaed by the government, and never called. He was called to the witness stand really without any expectation of what he may or may not do. And as you read the transcript, you can see, again, this is a crisis of conscience. This is a man who is at the point where he wants to set the record straight. Where in the record does it show what Rubio would have said beyond whether she knew or not? Is there an offer approved for? Where is that in the record? The only place that I can point to it in the record is his statements that he then made to Officer Chavez, his statements against interests. These statements he made to Officer Chavez, they would show that she didn't know? I think it could be reasonably inferred that she didn't know and that he set her up. Because what the Court did do is it allowed almost every single statement that was against Valente Rubio's interests in. Again, there's a whole laundry list. The only thing the Court didn't let in was sort of the linchpin or summary or culmination of all those separate facts. Look, she didn't know. I set her up. Well, if everything came in through Chavez, the husband, then why do you need Rubio? How is there harm? Well, I think there is harm because, Your Honor, what you have is you have an individual, the real culpable party. And after all, what are we all here for? It's justice. The real culpable party who was involved in smuggling this dope into the United States took the witness stand and attempted to fall on the sword. But for the District Court, he would have done so. It's clear in the record. To answer your question, I think we got our second best evidence. But I still think she was convicted and she was entitled to present a defense. And if the most powerful and forceful component of her defense was the party who actually had knowledge of the drugs and who set her up, that individual should have been allowed to testify. What happened with Mr. Rubio? Was he charged? Mr. Rubio was not charged. Much to, I think, Your Honor, in speaking, I do have some experience in the Southern District. I think the problem is that because it's the busiest district in the country in terms of border busts and these types of cases, the government takes a very reactive approach to these cases. And as long as it has its person, it has its load of dope, and it has its vehicle, you're really practically, the system is turned on its head. You as a defendant in that situation are not innocent until proven guilty. You're guilty until proven innocent. You must give, particularly in this 9-11 world that we're living in with jurors the way they are about border security, if you didn't know the dope was in there, well, you better give us an explanation as to how it got in there. You are almost compelled to put on a defense in a border bust case because these days an argument to the jury that, look, the government just didn't prove its case is not hacking it. It's not. And which lays out a number of other problems that we've put in our brief. I see that I have two minutes remaining. I'd like to reserve that time. You may. Your Honors, may it please the Court, Stuart Young on behalf of the United States in this matter. I think there's a couple things that probably first need to be addressed. In terms of the look she didn't know comment, I think Judge Burns correctly identified two problems with that actual statement. One was personal knowledge, Rule 602. There's no way that Mr. Rubio could actually testify as to what the knowledge of Ms. Chevarria's. Well, that's not really true. The problem that I have with that thing, that whole aspect, is that the question that was asked was a perfectly proper foundational question. Do you know whether or not? And the answer to that is yes or no. And if he said yes, there's another foundational question, how do you know? And then if that's not sufficient to establish personal knowledge, then your objection is fine. But you objected and the answer was stricken and that was that. And so we don't really know whether Mr. Rubio has personal knowledge of whether or not she knew that the methamphetamine was in the truck. Well, I think the analysis actually goes just a little bit further than that as well, though. I think especially if Mr. Rubio actually had personal knowledge, actually knew that she had personal knowledge, it's only in the affirmative in that she could have had knowledge that the drugs were in there, but had not told him that she knew about it. And so I think there's actually, it's a further analysis than just whether or not he had told her or not told her. Given the circumstances of this case, he had asked her, well, according to the record, she had received a call from him to go down to Tijuana. She'd swapped cars with somebody who Anthony Rubio did not know. And then as she's coming back across the border, it was clear that the gas tank, that the gas was emanating from the gas tank. And so I think in that case, even if Mr. Rubio had not told her that there were drugs in the car, it's clear that she might have known. And so therefore, to have him opine as to whether she knew or not, I think still goes to the essential problem with Rule 602. I think additionally there's an issue with it's not actually a declaration against interest. From Mr. — later on, the defense counsel was trying to bootstrap these statements to come in through Officer Chavez. And part of the problem there was that it wasn't a declaration against interest, that she didn't know. The statements that did get in about the methamphetamine and where it was and how Mr. Rubio thought that the methamphetamine was supposed to be in a certain place in the engine block rather than the gas tank. It seems as if it's against penal interest because how would he know if she knew if he didn't know about the whole thing, about the whole dope setup? Well, I think it's actually against penal interest in that if he makes statements such as, I set her up, I was the person who told her to go down there, I didn't inform her that there were drugs in the car. I think that's clearly against his penal interest. I think that's clearly a statement that could come in. Those weren't the statements in this case. The statement was, look, she didn't know. And so, again, that's Ed Williamson makes that. I don't know if she didn't know if you didn't know. I'm sorry, what? I didn't catch the question. I apologize. I'm not going to try to repeat that. Okay. How is it that she didn't know if we didn't know? How would he know if she didn't know if he didn't know? Exactly. And that's part of the problem with letting in some kind of statement like this. I think it's clear that, I mean, if basically it's essentially going to an ultimate conclusion for the jury, much like expert witness testimony, which would opine on the ultimate conclusion. The ultimate issue here was knowledge. And he's essentially going to knowledge. He's essentially testifying as to what she did or didn't know. Okay. So was her defense at trial she didn't know? Exactly. Her defense was unknowing drug courier and that she had been set up by Mr. Rubio. Okay. So let's suppose that there were these errors in the record. What was the evidence at trial that came in that would make those errors harmless? I think there was, if I understand your correction correctly, let's say that in terms of errors, you mean that the testimony, Mr. Rubio's testimony, should have come in? Is that one of the errors? Right. Okay. In terms of, there was testimony by Anthony Rubio, which talked about how Ms. Chavez had received a phone call and had gone down to the border, had picked up this car from an unknown person that she didn't know, that Anthony Rubio didn't know, but it appeared that she did actually know this person. She swapped keys with that person, got into a truck, and drove back across the border. There's also evidence in the record that she, as she's coming through the border, she didn't declare anything and that she made statements that her husband was an officer of the LAPD. At that point, given additionally the gas tank smell and so forth, I think there's a number of indicators that demonstrate that there was knowledge. Additionally, the expert testimony that brought in was not, was on unknowing drug courier testimony. And essentially what that testimony was, was in cases that include 82 pounds of methamphetamine. This is a huge load of methamphetamine that generally drug trafficking organizations let people know that they're driving these types of drugs across. In terms of the problem with the gas tank, the gas tank was actually filled with this 82 pounds of marijuana, I'm sorry, methamphetamine, and the gas tank gauge indicated that it was completely full. Now, Mrs. Shavaria was heading back up to Lancaster, which is 150 miles away, in a Chevy Silverado truck. There's no way that truck is going to get up there and half a tank of gasoline. So part of what was argued later on was that she clearly had to have been told, because if she hadn't been told, she likely would have run out of gas. She either would have had to go to, had to call AAA or her husband, who's an LAPD officer. And so drug trafficking organizations would not want, would tell somebody that they had this amount of methamphetamine and that she shouldn't, you know, she should continually fill up with gas, because the gas tank, the gas tank gauge, which is only, which says completely full, is not, the gas tank's not actually full. So I think those are among the facts that were in evidence to clearly demonstrate that there's a knowledge there on her part. Now --" Just another question. I'm, rather than me spending time looking up the case, but the example we were using, the prevention of Mr. Rubio's testimony, that would be structural error, right? If that, if we were to find that the judge went overboard in his admonishments and met the vivacious standard, that would, that would be structural error. That would require reversal, regardless of how much other evidence. You know, I think it's actually an abusive discretion standard, Your Honor, and so I don't think it's actually, I don't, I, if I can speak to actually the statements that the judge made for just a moment. I've, going through and parsing the record, it's clear on, on three occasions on the record, 235, 241, and 276, the defendant actually agreed with the judge's decision to have the judge call a counsel to the defense, to the defense, to the defense, to inform witness of his rights. It's also interesting, it's important to point out that the judge actually flagged this issue earlier on, back in the record on page, on page 20, back on January 6th, because defense counsel was, was explaining that they might have a witness who was, who was going to come and going to exonerate their client. This wasn't Rubio, this was a different person. And Judge, Judge Burns specifically stated, you might have both an incompetency problem in terms of what, testifying as to what Ms. Shavaria knew, and also, we're going to probably need to advise that witness of their Fifth Amendment rights. And so this issue had been flagged. Part of the problem, though, is that the, the trial court judge was put in a, in a difficult position once Mr. Rubio had already been testifying. He had not been advised that there was this potential Fifth Amendment issue. Mr., the defense counsel had not provided any offer of what might happen during testimony, during testimony. And so, so I think it's, I think it's clear, given that the district court was put in a, in a difficult position here, that, that the admonishments that he made to the, to the witness were not, were not out of the ordinary. But on page 237. Start down and look at that transcript. First of all, you have, what did you ask her to do, the defendant to do? And the, the attorney for the, which is sort of unusual, I think, for the defendant, says, well, maybe you better warn him of his Fifth Amendment rights. Usually you would hear that coming from the other side. But now the next thing that happens is the judge agrees with that, goes on and on, presents a lengthy and very well-stated statement of his Fifth Amendment rights. And then he says, do you want to answer the question? And he says, I will. And the judge says, you will? I better get you an attorney. And the implication being very strong, I better get you an attorney and who's going to persuade you not to testify because you may incriminate yourself. It has a feeling like it goes much beyond just warning him that he's got the Fifth Amendment rights. And at the expense of the defendant. I understand what you're saying, Your Honor. And I think this is a little bit different than, say, the Arthur case, though. If I may read from the record, page 237, it doesn't make any difference to me what you do. I'm not trying to suggest that you answer or not answer. Page 238, you don't have to answer if you don't want to. You can if you want to. On page 241, it's up to you whether you want to testify or not. I'm not advocating one way or the other. So so you've also got some language in there about I'm concerned that you may be forfeiting your Fifth Amendment rights, and there's other language which somewhat offsets that, what you've just read. Which is exactly mirrors the Santiago case. And I think it also mirrors the Arthur case. The Arthur case was much more strongly stated by the district judge. The Arthur case, I think it's also important that the Arthur case, the witness was actually represented by a court-appointed counsel and elected to testify against the advice of that court-appointed counsel. It's clear in the Arthur case that the witness Fields was asked by the court, said, do you have counsel? And the witness says, yes, I do. I'm going to continue to testify. In this case, the witness did not have did not have counsel. I think it was an appropriate decision. And defense counsel agreed on the record that it was an appropriate decision that you think the defense counsel in suggesting that the admonition be given really waived the lengthy admonition that was given and then repeated several times? Is that fair to say? I'm not so sure that's fair to say, Your Honor. I think it was important. I think the trial court, the trial judge in this case, because he was worried he'd been put in this difficult position, this issue had not been flagged before, needed to make sure that he'd given this correct admonition. And I don't think there's anything in the record in his admonition that indicates either duress or is incorrect in any kind of phraseology of what the rights the witness had. So the judge gave you that admonition. Would you feel comfortable coming back into court and saying I'm going to waive my right? Well, I think with the statements of it's up to you, I don't care either way. I'm not suggesting that you do testify. I'm not suggesting that you don't. I think he qualified it very clearly here at least three times. There was no qualification. Do you feel comfortable? What? In spite of all that, after the judge says you will, I better get you an attorney to advise you so you won't testify. I didn't say that, but that's heavily inferred, I think. I think that's a fair inference, Your Honor. But I think in the same way, the way Judge Burns phrased it was very clear. And having interacted with him quite a bit, he is the type of person who makes no bones about whether he has an interest or not. He clearly stated on this record, I don't have an interest here. You can testify, you can. Why don't you talk to counsel? And again, in the record, defense counsel three times stated that that was the correct course of action. Once Mr. Rubio talked to his counsel, he declined to make a, to testify further. I think it's important, though, that, sorry, I'm looking for my case notes. I think it's important to note that in terms of the actual, the actual admonitions themselves, there weren't, there wasn't duress here, especially in the case of Webb v. Texas. That was a clear indication where the judge says, I'm going to personally make sure that you're prosecuted here if you, if you perjure yourself. I'm personally going to make sure that things happen. And that's because the judge in Webb had an indication that the witness might lie on the stand. It's not the same case here, Your Honor. In this case, the judge had a clear indication that there might be something incriminating said. And so it was important that this person not be swayed by defense counsel or anybody else, but get some, get some clear guidance as to what his rights were. And I think, I think any other situation, I think this was the correct result in any situation involving this type of, this type of witness. You better cover anything else now you want to cover. In terms of, I believe I've already covered the 801, I'm sorry, the 804B3 issue in terms of the, the testimony that came in. And I think it's important to note that 95% of the testimony that, that Mr. Brown wanted came in through George Chavez. And it's, it's also. That would go to prejudice. I'm sorry, what? The standard we were addressing was, is a structural error. The, I think the, the answer is that if we do find error, we have to examine whether or not there was prejudice. I, I think you're, I think you're correct, Your Honor. I mean, I think, I think there was, there was clearly, there was clearly enough basis covered here. And, and I, and I don't believe that the judge abused his discretion in, in, in, in not allowing the testimony of Mr. Rubio, or I'm sorry, of admonishing Mr. Rubio, and then not allowing one portion of George Chavez's testimony that would talk about what Mr. Rubio said. Therefore, I think, unless there are other, any other further questions on any of the other issues, I think I'll submit. All right. Thank you. Thank you. Thank you. As much respect as I have for Mr. Young, I think the question, would you feel comfortable after this long admonishment to continue testifying? That question was never answered. Is comfortable, is that a good way to phrase it? Is that enough that you were a little uncomfortable about coming back in, or quite uncomfortable, or does it have to be more than that to be duress? In this case, I think it amounted to duress. You have four to five pages of transcript where the judge, over eight times, and provides his own analysis. He's basically acting as that witness's lawyer and saying, look, do not testify. And after all that, the witness said, I'll answer. So was there any of that before the jury? When the admonishment was going on? Any of it. No, no. Okay. And the other question is, so if the evidence came in through Lieutenant Chavez that she didn't know that the drugs was there, was your client prejudiced as to where to find error? Yes. How? Most definitely, Your Honor. This is structural error. This is where my client was denied her Sixth Amendment right to present a defense. There was a witness who came on the stand. It was apparent to everybody. It was a clean situation where this witness wanted to exculpate her, inculpate himself, and explain what had happened. He was having a crisis of conscience. It's structural error. The district court took it upon itself to over-admonish him. And maybe not rising to the level of Webb, but certainly beyond Arthur, which was a reversal, and scared the witness off the stand. Even when the witness, after all the admonishment, said, yes, I will answer, we still have a situation where the judge wouldn't let him. The judge would not let this witness testify. It's structural error. This case could have ended up a lot differently. With one of the last issues that we raised, the trial date was advanced a week, which we believe was an abuse of discretion. I think it is just another part of the prejudice in which the case finds itself as we stand here today. All right. Thank you, Counsel. Thank you. So U.S. v. Shabria will be submitted, and we'll take up U.S. v. Ford.
judges: Thompson, Wardlaw, Reed